# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39576**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Derek J. MCINNIS**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 May 2020

————————————

*Military Judge:* Matthew D. Talcott.

*Approved sentence:* Dishonorable discharge, confinement for one year and 10 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 1 August 2018 by GCM convened at Peterson Air Force Base, Colorado.

*For Appellant:* Major David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges*.

Judge D. JOHNSON delivered the opinion of the court, in which Senior Judge MINK and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

D. JOHNSON, Judge:

A general court-martial composed of a military judge convicted Appellant, contrary to his pleas, of one specification of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C.

§ 920b, and one charge and specification of unlawful entry in violation of Article 134 UCMJ, U.S.C. § 934.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for one year and 10 months, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises five issues on appeal: (1) whether the military judge erred when he determined that Appellant's mistake of fact as to the identity of the victim only related to a general intent element of the crime and therefore must have been objectively reasonable;[2] (2) whether the evidence was legally and factually sufficient to support his conviction for sexual abuse of a child; (3) whether the military judge abused his discretion in failing to suppress Appellant's statement to Carnival Cruise Lines security personnel which was obtained without a rights advisement; (4) whether Appellant's trial defense counsel were ineffective for failing to seek suppression of Appellant's statements to the Air Force Office of Special Investigations (AFOSI);[3] and (5) whether the military judge erred by admitting Court Exhibit 1, the "unsworn statement" of AR's biological mother, in violation of Rule for Courts-Martial (R.C.M.) 1001A(c). Issues (3) and (4) warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

Appellant and his family were on the Carnival Triumph cruise ship in the Gulf of Mexico heading for New Orleans, Louisiana, after departing from Mexico in late November 2017. Although Appellant was traveling with his mother, his mother's boyfriend, and the boyfriend's family, Appellant had his own cabin (number 2238).

While on the cruise Appellant had seen a woman, later identified as MB, whom he found attractive and wanted to ask out. Appellant did not know MB's name; he just saw her in the hallway and followed her back to her cabin (number 2338). MB's cabin was on the same level as Appellant's cabin but the

---

[1] All references to the Uniform Code of Military Justice (UCMJ) and Rules of Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] For ease of discussion we renumbered assignments of error (1) and (2).

[3] Appellant submits issues (1), (3) and (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

two cabins were not close to each other. Once MB entered her cabin, Appellant decided he wanted to talk to MB so he knocked on her door with the intention of asking MB to "hang out." He knocked on her door on at least two occasions, about two or three minutes apart. After knocking, Appellant became nervous, so both times when MB answered the door Appellant told her he had the "wrong room" or that he was "looking for someone else."[4]

On the fifth and final night of the cruise, after Appellant's traveling companions had gone to bed, Appellant purchased four double Crown Royal whiskey and cokes, and then two shots of another whiskey at the dance club all within about an hour and 15 minutes. Appellant would later tell investigators that he consumed all the drinks he purchased and that he consumed one or two more drinks with "some other friends he met onboard." If Appellant's statements to investigators are accurate, he consumed a total of eleven or twelve drinks.

Between 0430 and 0630,[5] Appellant walked toward cabin 2338. Two doors down was cabin 2330. The ship's security footage showed Appellant swaying and leaning against the wall as he walked down the passageway. However, testimony at trial revealed the ship was "shifty" that night because of damage to the propeller. The security footage showed Appellant standing outside cabin 2330 for approximately two and a half minutes at which point he entered the room through the cabin's single door which was unsecured.

Inside cabin 2330 was AR, a 7-year-old girl; HB, AR's godfather and guardian; QH, AR's godmother and guardian; and TW, another child. HB and QH were sleeping in a queen bed, and AR and TW slept on bunk beds attached to different walls. When folded down, the bunk beds extended into the cabin at a height of approximately four to five feet above the deck. AR's bunk was on the right wall as one walks into the cabin and extended over the queen bed, TW's bunk was attached to the wall over the head of the queen bed. Security footage revealed that Appellant was in AR's room for approximately nine minutes before he emerged from the room.

---

[4] While it is not clear what day Appellant knocked on MB's door, it did not occur on the last night of the cruise. MB testified it was daylight and before breakfast when a "tall" young man knocked on her door at least twice about 15 minutes apart.

[5] Still pictures of the security footage admitted at trial has a time stamp of 0430 and security footage admitted at trial has a time stamp of 0630. Special Agent (SA) AP, of the Federal Bureau of Investigation testified Appellant stated it was around 0530. The exact timing is not needed for our analysis.

AR testified that she awoke to a "white man" rubbing her back at which point she called out for her godmother, QH. HB testified that he awoke to AR saying "Mom. Mom. Someone's in our room," and he observed Appellant easing towards the door. HB saw Appellant due to the illumination of the bathroom light which was kept on for the children. When HB asked Appellant what he was doing in their room, Appellant "bolted" towards the door, exited and ran. Security footage showed Appellant running from AR's cabin with HB chasing after him.

On the security footage Appellant is seen running through the various ship passageways and falling on two occasions. During one fall Appellant's pants are falling down to thigh level. After evading HB, later footage shows Appellant's hands in front of his waist as if he was closing or adjusting his pants.

After Appellant adjusted his pants, HB caught up to Appellant. HB testified he asked Appellant what he was doing in their room, but Appellant did not respond. HB began walking Appellant to the security desk holding onto Appellant's shirt. HB testified that although he was holding onto Appellant's shirt, Appellant was walking on his own. Once HB and Appellant entered the elevator, Appellant started to slump over like he was "really, really intoxicated" and at that point HB said to Appellant, "Man, stand up. You're not that drunk." At that point, Appellant stood back up. Once they arrived at the service desk, Appellant again began to slump. HB testified that Appellant "smelled drunk."

Cruise ship personnel placed Appellant in a wheelchair and wheeled him to the medical center. A cruise ship employee testified this was a precautionary measure because Appellant's eye was bleeding and he would not respond to questions.[6] The employee also testified that Appellant smelled of alcohol, had blood shot eyes, and appeared inebriated, but was able to sit up in the wheelchair.

After returning from the medical center, Appellant was detained by Carnival security personnel in a stateroom on the cruise ship. The chief security officer aboard the ship, AS, interviewed Appellant.[7] When AS asked Appellant if he remembered anything, Appellant said he remembered drinking a

[6] There was evidence introduced at trial that Appellant may have been punched by one of HB's sons who were also on the cruise, but not staying in HB's cabin.

[7] Cruise ship personnel did not read Appellant his *Miranda* rights which formed the basis for the Defense's motion to suppress Appellant's statements which was denied by the military judge, and this court found warranted no further discussion or relief.

lot of alcohol. When asked whether he remembered entering somebody else's cabin or running out of the cabin, Appellant replied "I don't remember anything else. I don't remember going to somebody else's cabin or running out."

Once the ship docked in New Orleans, Special Agent (SA) AP and SA CB with the Federal Bureau of Investigation (FBI) and Task Force Officer Detective AW, boarded the ship, reviewed the security footage, and interviewed Appellant.[8] SA CB and Detective AW were also present for Appellant's interview. SA AP testified at trial that Appellant told him "multiple stories." Appellant first told SA AP that he had been drinking, decided to return to his own cabin, but entered the wrong cabin. After entering the wrong cabin, Appellant was feeling his way around the cabin "in a circular motion" when he touched a little girl, who eventually screamed. This "freaked [Appellant] out" who "knew what he was doing was wrong," so he ran out of the room, "chased by the little girl's father."

About halfway through the interview, SA AP and Detective AW departed and Appellant spoke to SA CB alone. SA CB testified that Appellant explained for the first time that he had previously seen a 30-year-old female on the ship who he did not know, but found attractive and that he had knocked on her door a few times.[9] After SA AP and Detective AW rejoined the interview, Appellant then explained that sometime around 0530 he wanted to find this woman to have sex with her, so he went to her hallway, but he didn't remember exactly which room she was in. Appellant discovered a cabin door that was not fully closed, so he waited outside the room for a few minutes and then entered. Appellant told the agents he knew what he was doing was wrong; that he was not allowed to enter that cabin; that he was not invited into the room; that he decided to enter anyway; and that his sole intention was to try to arouse the female in order to have sex with her.

Appellant further informed the two FBI agents and Detective AW that as he entered the room he felt his way around until he came to the bunk bed on the right which was at eye level. SA AP testified that Appellant told investigators that

> while [Appellant] was in the room, he . . . was trying to wake
> up the female to have sex and he was rubbing her back. At one
> point [Appellant] said . . . it was in a circular motion, and [Appellant]
> moved approximately 2 inches lower on her back, still

---

[8] The record does not reveal which jurisdiction Task Force Officer AW represented.

[9] MB was 38 years old at the time of the cruise.

rubbing her back, and he was sexually aroused, and he doesn't remember unzipping his pants, but it's possible that he could have, and it's also possible that he was masturbating.

Several weeks later, Appellant was interviewed by special agents of the AFOSI. Appellant's interview was video recorded and admitted at trial. After waiving his rights under Article 31, UCMJ, 10 U.S.C. § 831, Appellant told the AFOSI agents different versions of the events just as he had earlier told different versions of the events to the FBI agents and Detective AW. First, Appellant told the AFOSI agents he was looking for the lady he "met a while back" to see if she wanted "to do something." Appellant could not remember which cabin the woman was in and the numbers "started getting all wobbly" to him so he decided to return to his own cabin. As he was returning to his cabin, he entered the cabin "where the girl was" which he thought was his room. The room was dark so he was feeling around when he heard the girl scream and realized it was not his cabin. He thought "I need to get out of here" but didn't remember running, but thought he remembered falling. Appellant next remembered a doctor "touching him up a little" and then being back in his room. Appellant did not respond, when pressed by AFOSI, on why he did not turn on the light if he thought he had entered his room.

Later in the video recorded interview, Appellant told AFOSI that he entered the room looking for "the 30-year-old woman;" but the cabin numbers were getting blurry. He thought he found her room and went to knock on the door. When he went to knock, he noticed the door was open and he went inside the "dimly lit" cabin. Even though the room was dimly lit, Appellant could not "tell what was what." As he felt around, he thought he "found her" and was attempting to wake her by rubbing her back through her shirt. Appellant did not remember saying anything to her but started to "touch himself through his pants." He said he "heard the girl scream" and he ran out of the room. Appellant remained adamant throughout the interview that he did not remember unzipping or undoing his pants, his pants falling down, or being punched.

## II. DISCUSSION

### A. Mistake of Fact

#### 1. Additional Background

Prior to closing arguments on findings, the military judge indicated he would consider mistake of fact as to identity as a defense applicable to the sexual abuse of a child offense. He informed counsel that in Appellant's case, there are only two elements: "sexual contact with a child with the intent to gratify sexual desire." He further stated that he was "struggling to see the

element [the mistake of fact defense] would eliminate," but as to "the identity issue, if it negates an element, to [him], [it] could only negate the child element." While trial defense counsel conceded there was no specific intent requirement for the first element of sexual abuse of a child, trial defense counsel asserted only an "honest," not an "honest and reasonable," mistake of fact as to identity of the victim was required.

Trial defense counsel further argued that the second element of sexual abuse of a child should be read "in conjunction" with the first element, thus requiring a specific intent to gratify his sexual desire by touching a child. Trial defense counsel explained:

> So essentially it would go to that -- essentially that *mens rea*, as far as the specific intent to gratify his sexual desire by touching a child. So looking at the second element that he did so with -- that he did so. He did touch the child with the intent to, in this case, gratify his own sexual desire.

Trial defense counsel conceded he could not cite any case law to support his position and noted it was a "novel issue." Trial counsel argued, "there are two separate elements and that the act of touching a child is general intent," and if the military judge considers a mistake of fact defense "it's honest and reasonable versus just honest." The military judge agreed with the trial counsel.[10]

On appeal, Appellant renews the argument that his mistake of fact as to identity only must be honest, not honest and reasonable. Appellant contends that the words "did so" in the second element of sexual abuse of a child "necessarily incorporate[s] the first element" of sexual contact upon a child.

---

[10] While the parties, to include the military judge, did not refer to the *Military Judges' Benchbook,* it provides the following guidance as to when a mistake must be "honest and reasonable."

> The standard for ignorance or mistake of fact varies with the nature of the elements of the offense involved. If the ignorance or mistake concerns an element of an offense involving specific intent (e.g., desertion, larceny), willfulness (e.g., willful disobedience of an order), knowledge (e.g., assault upon commissioned officer, failure to obey lawful order), or premeditation, the ignorance or mistake need only exist in the mind of the accused. Generally, for crimes not involving specific intent, willfulness, knowledge, or premeditation, (e.g., AWOL) ignorance or mistake must be both honest (actual) and reasonable.

*Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 1697 (29 Feb. 2020).

The Government responds (1) that mistake of fact as to identity is not a defense at all because AR was under 12 years of age; (2) even if mistake of fact as to identity could be an appropriate instruction, the plain text of the statute implies that the mistake must be both honest and reasonable because the first element of touching a child is a general intent element; and (3) even if this court finds that the mistake of fact as to identity only needed to be honest, not honest and reasonable, Appellant was not prejudiced.

**2. Law**

"The mens rea applicable to an offense is an issue of statutory construction, reviewed de novo." *United States v. McDonald*, 78 M.J. 376, 378 (C.A.A.F. 2019). "In determining the mens rea applicable to an offense, we must first discern whether one is stated in the text, or, failing that, whether Congress impliedly intended a particular mens rea." *Id*. at 378–379 (citation omitted).

"As in all statutory construction cases, we begin with the language of the statute." *Id*. at 379 (quoting *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 450 (2002)). Appellant was charged with sexual abuse of a child in violation of Article 120b, UCMJ, which provides that "[a]ny person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child. . . ." *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.a.(c). A lewd act is defined as "any sexual contact with a child." *MCM*, pt. IV, at ¶ 45b.a.(h)(5)(A). Sexual contact is defined as "any touching, . . . either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, at ¶ 45.a.(g)(2)(B).

The elements of sexual abuse of a child are (1) that "the accused committed sexual contact upon a child by touching, . . . either directly or through the clothing, any body part of any person;" and (2) that "the accused did so with intent to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, at ¶ 45b.b.(4)(b).

The plain reading of the statute indicates that while sexual abuse of a child includes a specific intent element as to whether the touching was committed with the intent to arouse or gratify the sexual desire of any person, the fact the person being touched was a child is a general intent element. *Cf. United States v. DiPaola*, 67 M.J. 98, 101 (C.A.A.F. 2008) (finding that an indecent assault offense includes both specific and general intent elements, and it is the general intent element as to consent that requires both a subjective belief of consent and a belief that was reasonable under all circumstances).

There is "a critical distinction, long recognized in the corpus of law involving sex offenses, between a mistake of fact that goes to *degree* of legal and

moral turpitude, on the one hand, and a mistake of fact that goes to whether the act was legally or morally wrong *at all*, on the other hand." *United States v. Adams*, 33 M.J. 300, 302 (C.M.A. 1991). "The pertinent inquiry is whether the purported mistake concerns a fact which would preclude the existence of the required specific intent." *United States v. Binegar*, 55 M.J. 1, 5 (C.A.A.F. 2001).

It is a defense to sexual abuse of a child that the Appellant reasonably believed that a child had attained the age of 16 years if the child had in fact attained at least the age of 12 years. *MCM*, pt. IV, at ¶ 45b.a.(d)(2). "It is not a defense that the accused reasonably believed that the child had attained the age of 12 years." *MCM*, pt. IV, at ¶ 45b.a.(d)(1).

R.C.M 916(j)(1) states:

> it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused. If the ignorance or mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.

### 3. Analysis

Mistake of fact as to identity means Appellant held, as a result of ignorance or mistake, an incorrect belief that he was touching MB and not AR. *See id.* We assume without deciding that mistake of fact as to identity defense is different than a mistake of fact as to age defense. If Appellant was honestly mistaken, it was to the *identity* of AR, not her *age. See Adams*, 33 M.J. at 301 (mistake of fact as to a sex partner's identity is a legal defense to carnal knowledge where accused was asleep in his own bed and believed it was his wife fondling and arousing him, and not his niece). The remaining question is whether, to be a defense, a mistake of fact as to identity must have existed in the mind of Appellant (that is, the mistake need only be honest), or must have also been reasonable. *See Binegar*, 55 M.J. at 5; at 7 (concurring opinion); R.C.M. 916(j)(1).

To be a defense, Appellant's mistake of fact must have existed in his mind and been reasonable under all the circumstances. *See DiPaola*, 67 M.J. at 101; R.C.M. 916(j)(1). As such, Appellant's mistake of fact as to the identity of

AR has two elements, one subjective and one objective. "For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult." *United States v. Moore*, No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim. App. 11 Dec. 2018) (unpub. op.) (citation omitted) (describing the mistake of fact defense to abusive sexual contact under Article 120, UCMJ, 10 U.S.C. § 920).

For two reasons, we do not agree with Appellant that the "did so" verbiage in the specific intent element incorporates the first element of sexual abuse of a child transforming the first element into a specific intent element. First, Appellant's argument is belied by the plain language of the statute. Second, the purported mistake of identity of AR does not concern a fact which would preclude the existence of the required specific intent. We find the military judge did not err.

## B. Legal and Factual Sufficiency

Appellant asserts his conviction of sexual abuse of AR is legally and factually insufficient because (1) the facts at trial demonstrated that his level of intoxication was such that he could not form the requisite intent to arouse or gratify his sexual desire; (2) Appellant never conceded sexual interest in AR and his answers were qualified with "I don't know" or "it's possible" as Appellant could not remember due to his level of intoxication; and (3) Appellant had a reasonable mistake of fact as to the identity of the person he was touching especially in light of his level of intoxication. We are not persuaded and find his conviction for sexual abuse of a child both legally and factually sufficient.

### 1. Additional Background

At one point during Appellant's trial, the Prosecution played the following video recorded exchange between Appellant and SA TP of the AFOSI:

> [SA TP]: You started rubbing [AR's] back. And then what?
>
> [Appellant]: I mean, just rubbing the back.
>
> [SA TP]: I mean, were you getting horny because you thought it was a 30-year-old woman's back that you were rubbing?
>
> [Appellant]: Yeah.
>
> [SA TP]: So you started getting an erection or what?
>
> [Appellant]: Yes, sir.
>
> [SA TP]: And then what?

[Appellant]: That's -- I mean, I maybe touched down here (indicating), but I don't remember unzipping my pants.

[SA TP]: Okay. So were you touching yourself through your pants, then?

[Appellant]: Yes, sir, yes.

[SA TP]: You were?

[Appellant]: Yes, sir.

[SA TP]: So were you kind of beginning to masturbate?

[Appellant]: Yes, sir,

Later during the interview Appellant stated:

> I was feeling my way around the room. I thought I found her. So I was giving her a little nudge, like the "Hey, wake up" kind of thing. I don't remember saying anything. I'm starting to get a little aroused. I started touching myself through the pants.

At one other point during the video recorded interview SA TP asks the Appellant: "So you remember having your hand on her back and masturbating through your pants," at which point Appellant responds "Yes."

Evidence at trial demonstrated Appellant thought MB was around 30 years old. At the time of the cruise, MB was 38 years old, 66 inches tall, and weighed between 140–150 pounds. MB testified she was "not built like a child" and that Appellant had seen "her whole body" when he twice knocked on her door and she opened it. MB testified she did not wear her hair in a braid during the cruise.

AR was measured at 52.5 inches tall during trial. During the cruise, AR had braided hair down the length of her back with beads attached at the end. On the night of the incident AR's hair was pulled back in this braid.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omit-

ted). "Beyond a reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

"Voluntary intoxication may, but does not necessarily, negate the specific intent required for some offenses." *United States v. Peterson*, 47 M.J. 231, 233 (C.A.A.F. 1997) (citing *United States v. Anderson*, 25 M.J. 342 (C.M.A. 1987)). "It 'is not a defense to a general-intent crime, but it may raise a reasonable doubt about actual knowledge, specific intent, willfulness, or premeditation when they are elements of a charged offense.'" *Id.* (citing *United States v. Hensler*, 44 M.J. 184, 187 (C.A.A.F. 1996)). "When raising an issue of voluntary intoxication as a defense to a specific-intent offense, 'there must be some evidence that the intoxication was of a severity to have had the effect of rendering the appellant incapable of forming the necessary intent,' not just evidence of mere intoxication." *Id.* at 233–34 (citation omitted).

R.C.M. 916(l)(2) provides:

> Voluntary intoxication, whether caused by alcohol or drugs, is not a defense. However, evidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent, willfulness, or a premeditated design to kill, if actual knowledge, specific intent, willfulness, or premeditated design to kill is an element of the offense.

Appellant was charged with sexual abuse of a child in violation of Article 120b, UCMJ, which included the following elements: (1) that at the time and place alleged, Appellant committed a lewd act upon AR, a child who had not attained the age of 12 years, by touching AR's back with his hand and (2) that the Appellant did so with the intent to arouse and gratify his sexual desires.

*See MCM*, pt. IV, ¶ 45b.b(4)(b).[11] In this case, "child" means a person who has not attained the age of 16 years. *MCM*, pt. IV, ¶ 45b.a.(h)(4). A lewd act includes "any sexual contact with a child." *MCM*, pt. IV, ¶ 45b.a.(h)(5). Sexual contact is defined as "any touching . . . either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45.a.(g)(2)(B).

**3. Analysis**

Having decided that Appellant's mistake of fact must have existed in his mind and been objectively reasonable, we next consider whether the evidence is legally and factually sufficient to support a finding of guilt for sexual abuse of a child.

### a. Level of Intoxication and Specific Intent

Appellant first argues his state of intoxication prevented him from forming the requisite intent to arouse or gratify his sexual desire. Appellant posits that (1) Appellant's bar receipt demonstrates that Appellant rapidly consumed 11–12 drinks; (2) security footage shows Appellant clearly swaying from the effects of alcohol; and (3) cruise ship personnel "recognized his severe intoxication and took him for medical treatment." Appellant avers these facts "establish that Appellant was intoxicated such that he could not form the requisite intent to gratify his sexual desire."

However, the Government argues that Appellant was able to recall exactly how many drinks he consumed at the dance club that evening, that he left the dance club around 0200, that he spent time conversing with other passengers and consuming another drink. He remembered his reason for going to AR's hallway which was to go to the room of a female passenger and engage in sex. Appellant was able to recall that he entered the room that was not his, feeling his way through the room until he reached a bunk bed, rubbing a person's back until he was aroused, and then running from the room once AR called out for her mother. Although Appellant claimed to have no memory of being chased throughout the ship by HB, undoing or unzipping his pants, his pants falling down, or being punched, a reasonable fact-finder could find Appellant's claimed lack of memory not credible. The Government concludes that these facts preclude Appellant's argument that his state of intoxication prevented him from forming the requisite intent.

---

[11] Although sexual contact is defined as "any touching . . . if done with an intent to arouse *or* gratify the sexual desire of any person," Appellant was charged with sexual abuse of a child by touching AR's back with his hand with intent to arouse *and* gratify his sexual desires. *MCM*, pt. IV, ¶ 45.a.(g)(2)(B) (emphasis added).

In addition to the arguments made by the Government, the military judge, as the factfinder, could have determined Appellant's ability to run down various ship passageways as shown on the security footage refuted Appellant's contention that he was unable to form the specific intent due to his level of intoxication. The military judge may have also determined that even if Appellant's "swaying" was from the effects of the alcohol as he claims, that fact did not necessarily indicate a level of intoxication that raises reasonable doubt as to the existence of specific intent.

As to Appellant's challenge regarding his level intoxication as observed by cruise ship personnel, the military judge could have found that the trial testimony, and security footage revealed Appellant exaggerated his level of intoxication when cruise ship personnel approached. The military judge heard testimony from HB that after he and Appellant entered the elevator Appellant started to "slump over" as if he were "really, really, intoxicated" but stood back up after HB told him to because he was not that drunk. Furthermore, a cruise ship employee testified Appellant was bleeding from his eye, and although he appeared intoxicated he was able to sit up straight in the wheelchair.

Finally, Appellant stated in the video recorded interview that on more than one occasion he was aroused and touched himself through his pants, further demonstrating his clarity of thought, and that his level of intoxication did not raise reasonable doubt as to his specific intent to arouse and gratify his sexual desires. A reasonable factfinder could have determined all these facts demonstrated Appellant's voluntary intoxication did not cause reasonable doubt about his specific intent to arouse and gratify his sexual desires.

### b. Appellant Never Conceded Sexual Interest in AR

Appellant next asserts that he never "conceded any sexual interest" in AR when he made his statements to the FBI or AFOSI and that his statements concerning whether he was masturbating inside the room outside his pants or otherwise were a result of FBI and AFOSI questioning. Appellant avers he made his statements to AFOSI because they would not accept answers of "I don't know" or "it's possible;" AFOSI agents stormed out of the room in anger when he attempted to answer with "I don't know" or "it's possible;" and Appellant's statements were the result of this type of questioning by AFOSI. However, as noted above, Appellant's responses on whether he was aroused and touching himself over his pants were not qualified. Appellant consistently maintained throughout the interview that he did not recall exposing his penis; did not recall unzipping or unbuttoning his pants; and did not recall the events after he ran from the room. Therefore, a reasonable factfinder could have determined his argument that AFOSI's responses to his answers and form of questioning somehow impacted his responses, or overcame his

will with regard to his statements concerning sexual arousal was not persuasive.

### c. Appellant's Level of Intoxication and Mistake of Identity

Finally, Appellant avers his level of intoxication contributed to his subjective belief that he was entering the room of and touching MB. Appellant argues that his mistake was reasonable considering MB and AR's door were only separated by one door, and a single number (2330 vice 2338). A reasonable factfinder could have determined otherwise.

The germane question is whether Appellant had a reasonable mistake of fact as to the identity of the person he was touching. As noted above, Appellant's mistake of fact as to the identity of AR has two elements, one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult. *See Moore*, unpub. op. at *12. Voluntary intoxication is not relevant to the question of whether Appellant had a mistake of fact as to the identity of AR because the first element of sexual abuse of a child is a general intent element, not a specific intent element.

A reasonable factfinder could have determined Appellant's claimed mistaken identity was not reasonable. Appellant contends he mistook a 38-year-old woman who was 66 inches tall, weighing 140–150 pounds at the time of the cruise with a 7-year-old girl who was 52.5 inches tall at the time of trial.[12] Furthermore, evidence at trial demonstrated that during the cruise MB had shoulder length hair and AR had braided hair down her back to her waist with beads at the end. Finally, AR and HB were able to see Appellant because of the bathroom light illuminating the room, indicating the cabin was not as "dimly lit" as Appellant claimed.

In assessing legal sufficiency, we are limited to the evidence produced at trial and required to consider it in the light most favorable to the prosecution. The bulk of the evidence produced at trial included Appellant's own words to AFOSI. While not all the evidence was free from conflict, it did not have to be. *See Wheeler*, 76 M.J. at 568 (citation omitted).

After considering all of Appellant's challenges and drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence is legally sufficient to support Appellant's conviction for sexual abuse of a child. *Barner,* 56 M.J. at 134. Moreover, having weighed the evi-

---

[12] Evidence of AR's weight was not introduced at trial.

dence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of sexual abuse of a child beyond a reasonable doubt. *See Turner,* 25 M.J. at 325. Appellant's conviction for sexual abuse of a child is therefore both legally and factually sufficient.

**C. Court Exhibit 1**

On appeal, Appellant argues that the military judge abused his discretion when he admitted Court Exhibit 1, the unsworn statement by AR's biological mother (JR); and he was prejudiced because trial counsel relied on Court Exhibit 1 to argue for admission of the victim impact testimony of QH. Appellant avers the record does not indicate that AR's biological mother was ever appointed in writing as a designated advocate under R.C.M. 801(a)(6) and R.C.M. 1001A(e). Without such appointment, Appellant argues JR may not assume the victim's rights under Article 6b, UCMJ, 10 U.S.C. § 806b. Appellant further avers Court Exhibit 1 substantially influenced the adjudged sentence and the victim impact was powerful as "loss-of-innocence arguments" tend to be; as such, the materiality and quality of the evidence was significant. We are not persuaded that admission of Court Exhibit 1 substantially influenced the adjudged sentence and prejudiced Appellant.

**1. Additional Background**

AR testified during the Government's case in findings that when she saw Appellant in her room she was "sad" and she "just wanted to punch him in the eye." Both HB and QH testified during the Government's presentencing case concerning how Appellant's crimes impacted their family and AR. HB testified that it scared him that he could not protect his family because Appellant was in their room for nine minutes while he was asleep; he is absent most nights at home due to his job and he noticed differences in his wife's sleep patterns since this incident; and they updated the security on their house since the cruise for protection when he is not home. QH testified that she was upset she could not protect AR; thinks about that night often; was more protective of AR after the incident; has difficulty sleeping; and continuously ensures doors are locked. As to the impact to AR, QH testified that AR slept with QH after the incident, AR followed QH's every move, and AR did not want to be alone.

When trial counsel asked QH whether she lost custody of AR due to Appellant's offenses, trial defense counsel objected stating it was "not proper aggravation under R.C.M. 1001" because it was "not directly related to or caused by the offense." At that point the following exchange occurred:

[Military Judge]: I don't know what -- I don't know what I'm about to hear. I guess I need to hear it and I'll rule on whether I can consider it.

[Trial Defense Counsel]: Well, Your Honor, I think counsel is about to get into a custody issue. It's kind of beyond the facts of this case.

[Senior Trial Counsel]: Sir, you will receive Court Exhibit 1, which is an unsworn statement from [JR]. She's the biological mother of [AR]. And after this -- because of this incident, she sought custody of her biological daughter.

After hearing the testimony about the custody issue, the trial counsel stated: "Your Honor, I have nothing further for the witness. To consider this evidence, you need to consider the Court Exhibit 1, which I can provide to the Court at this time." While providing Court Exhibit 1 to the military judge, trial counsel stated it was an unsworn statement of JR, "the Article 6b guardian of [AR]."[13] When the military judge inquired whether there was any objection from the Defense, the trial defense counsel responded "Your Honor, just to the line about the biological mother taking custody back. Again, under – under –it's not proper victim impact under RCM 1001 – 1001(a)."

After overruling the objection, the military judge clarified:

---

[13] Court Exhibit 1 states:

> [AR] has a very big sensitivity to doors and locks. She calls and text me all the time while I'm at work. She likes to be under my husband as well when I'm not at home. One incident, I was taking her to the dollar store to get her a doll. They only had "white" baby dolls. [AR] expressed that she didn't want the white baby doll because it reminded her of the "the man". I wanted her to get the white baby doll to better explain the situation but she still didn't want it. Even though she has her own room, she always wants to sleep with me. Every time a door locks or makes noise, she gets scared and ask "mama did you hear that? what was that noise?" At the Hotel in Colorado Springs, CO, [AR] was very curious about the doors being locked and made sure the deadbolt lock on the door was in place. [AR] is always under me when we go places and while at home. I wanted custody back because I felt like I wasn't there to protect her. The story didn't make sense which is why I wanted her back with me because I wanted to keep an eye on her. When I found out what happened, I was sad and upset. I just wanted to have my baby back in my care.

I find that the reactions of [AR's] mother to this crime directly impacted [AR]: It changed her living situation; it changed the way her mother felt about her own ability to protect her daughter, about her own abilities to be the mother to her daughter. All of these clearly would have impacted [AR]. In the unsworn, [JR] makes this connection directly. To the extent, Defense Counsel, if you have evidence that rebuts this, you're free to admit that evidence and I'll give it its appropriate weight and it will impact how much weight I give to this. But on its face, and as described, this is appropriate victim impact. Evidence will be admitted and considered. Additionally, with regard to the testimony of [QH], I find it also to be appropriate victim impact testimony to the extent she cared for, had custody of [AR], and she no longer does. And according to [AR's] mother, this is a direct result of the commission of this crime and how her mother felt about it.

After QH finished testifying about losing custody of AR and after a recess, the military judge clarified:

. . . With regard to the victim impact testimony, for any reviewing court -- with regard to the testimony, the victim impact testimony regarding the custody issue, to the extent I consider the crime resulted in [AR's] two motherly figures doubting themselves and each other's ability to parent [AR], this directly impacted [AR], that [QH] was unable to protect [AR] while on the cruise, according to the victim unsworn, was the reason [AR's] biological mother sought custody [AR's] mother wished –

The direct emotional impact from the crime and the natural reaction of those involved are fair considerations as victim impact. Impacts on [AR] and how her parental figures view themselves, their safety, the safety of [AR], and their views on each other's ability to parent her are directly linked to this crime and are victim impacts.

These impacts apply to [HB], [QH], and [AR] herself. With that said, there are independent actors involved in any ultimate decision regarding custody. The ultimate decision on [AR's] custody situation were not necessarily a direct result of the accused's crime.

[AR's] mother and the judge, who awarded custody, made independent decisions. The decision-making process to seek custody, to question oneself, to question [QH], to feel guilt and frus-

tration from the crime are directly impacts of this crime. The ultimate custody decision made by some other court is not.

After both trial and defense counsel's sentencing arguments, the military judge clarified his earlier ruling.

> Any argument or suggestion that I considered the ultimate decision regarding the custody of [AR] as a matter in aggravation or victim impact, I have given no weight to. I have considered the custody dispute itself, the emotions involved, the guilt, the stress, the impacts that led [AR's] mother to seek custody as a victim impact, because it directly related to these crimes. I have not considered that [QH, AR's guardian] lost custody of AR as a matter of victim impact. In other words, the accused's crime did not take AR from [QH, her guardian]. I did not consider the evidence in [that] way.

**2. Law**

"Interpreting R.C.M. 1001A is a question of law, which we review de novo." *United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citation omitted). However, we review a military judge's decision to admit a victim impact statement offered pursuant to R.C.M. 1001A for an abuse of discretion. *Id.* at 383 (citing *Humpherys*, 57 M.J. at 90).[14] A military judge abuses his discretion when his decision to permit such a statement is based on an erroneous view of the law. *Id.* (citing *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013)).

In the absence of an objection at trial, we review claims of erroneous admission of evidence for plain error, which is established when: (1) there is error; (2) which was plain, clear, or obvious, and (3) the error resulted in material prejudice to Appellant's substantial rights. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (citations omitted).

---

[14] Appellate courts review a military judge's decision to admit evidence for an abuse of discretion. *See*, *e.g.*, *Humpherys*, 57 M.J. at 90. In *United States v. Hamilton*, this court held that victim impact statements offered pursuant to R.C.M. 1001A are not "evidence" but nevertheless applied the abuse of discretion standard in reviewing the military judge's decision to allow such statements to come before the court. 77 M.J. 579, 585 (A.F. Ct. Crim. App. 2017) (en banc), *rev. granted*, 77 M.J. 368 (C.A.A.F. 2018). When the CAAF applied the abuse of discretion standard in *Barker*, it assumed without deciding that such statements are evidence but noted it would decide that question in its review of *Hamilton*. *Barker*, 77 M.J. at 383 n. 9.

Where trial defense counsel objects to the admissibility of evidence on one ground at trial and a different ground on appeal, the new objection on appeal is reviewed under the plain error analysis. *United States v. Barnes*, No, ACM 38720, 2016 CCA LEXIS 267, at *7 (A.F. Ct. Crim. App. 27 Apr. 2016) (unpub. op.).

"A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (quoting *United States v. Cook,* 406 F.3d 485, 487 (7th Cir. 2005)). The Court of Appeals for the Armed Forces (CAAF) held "[w]hile we review forfeited issues for plain error, we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal." *Id.* (quoting *United States v. Pappas,* 409 F.3d 828, 830 (7th Cir. 2005) (quotation marks and citation omitted)); *see also United States v. Harcrow,* 66 M.J. 154, 156 (C.A.A.F. 2008). In determining whether a particular circumstance constitutes a waiver or a forfeiture, we consider whether the failure to raise the objection at the trial level constituted an intentional relinquishment of a known right. *Campos*, 67 M.J. at 332.

"However, the CAAF has made clear that the courts of criminal appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or forfeiture in a particular case, or to pierce waiver or forfeiture in order to correct a legal error." *United States v. Lee*, No. ACM 39531, 2020 CCA LEXIS 61, at *17 (A.F. Ct. Crim. App. 26 Feb. 2020) (unpub. op.) (citing *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (quoting *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016)).

Article 6b, UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at sentencing hearings related to such offenses. 10 U.S.C. § 806b(a)(4)(B). A victim covered by this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." 10 U.S.C. § 806b(b).

Under R.C.M. 1001A, victims in non-capital cases may exercise their right to be heard through sworn or unsworn statements. R.C.M. 1001A(b)(4)(B). Unsworn statements may be oral, written, or both. R.C.M. 1001A(e). Victims who are under 18 years of age may make an unsworn statement either personally or through a designee appointed under R.C.M. 801(a)(6). *Id.* R.C.M.

801(a)(6) requires the military judge to appoint a designee in writing.[15] Statements offered under R.C.M. 1001A "may include victim impact or matters in mitigation," and should neither exceed those topics nor recommend a specific sentence. R.C.M. 1001A(c); 1001A(e), Discussion. Similar to the definition under R.C.M. 1001, victim impact under R.C.M. 1001A means "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

When evidence is improperly admitted during sentencing proceedings, "the test for prejudice is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (internal quotation marks and citations omitted). When determining whether an error substantially influenced a sentence, this court considers the following factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017) (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, at 384 (citation omitted).

### 3. Analysis

Appellant alleges the military judge erred in three respects. First, the military judge did not properly designate JR in writing as AR's designated representative pursuant to Article 6b, UCMJ,; R.C.M. 1001A(e) and R.C.M. 801a(6). Second, the military judge considered the substance of the entire statement submitted by a non-appointed individual pursuant to Article 6b, UCMJ; R.C.M. 1001A(e) and R.C.M. 801(a)(6). Finally, the military judge considered the sentence in JR's written statement regarding custody over defense objection. Appellant's third allegation of error—the one line regarding JR seeking custody in Court Exhibit 1—is preserved by objection. Before we can consider the first two allegations of error, we must determine whether Appellant waived the issue and whether we will apply waiver or forfeiture.

---

[15] R.C.M. 801(a)(6) no longer requires the designation in writing from the military judge. *See* Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018); *Manual for Courts-Martial, United States* (2019 ed.).

### *a. Waiver*

Appellant appears to have not only waived his right to object to the military judge's failure to appoint JR in writing, but also to the military judge's decision to consider the substance of the remainder of JR's statement.

As to lack of appointment, the record of trial contains no written designation of JR as AR's representative. The only reference to JR having this role is one comment by the senior trial counsel that identified JR as "the Article 6b guardian" of AR. While there was extensive discussion of whether JR was a victim herself, neither trial defense counsel nor the military judge took issue with the senior trial counsel's comment that JR was AR's Article 6b representative. Under these circumstances, we find trial defense counsel made a deliberate decision not to present a ground for relief that might be available in the law. We do not know whether trial defense counsel did not present that ground for relief because he knew the military judge had properly appointed JR or because he knew that by objecting the remedy would be for the military judge to then appoint JR. Under either situation, trial defense counsel made a deliberate decision not to present a ground for relief when trial counsel identified JR as "the Article 6b guardian" of AR and trial defense counsel said nothing in response to that statement except to object to the line concerning custody.

With the admission of the entirety of Court Exhibit 1, this is not simply a case where an exhibit was admitted without any objection or comment from defense counsel. Here, prior to admitting Court Exhibit 1, the military judge asked if there were any objections and defense counsel expressly indicated that he had none other than "the line about the biological mother taking custody back." *See United States v. Davis,* 79 M.J. 329, 331 (C.A.A.F. 2020); *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017). However, the CAAF has made clear that the Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or forfeiture in a particular case, or to pierce waiver or forfeiture in order to correct a legal error. *See, e.g.*, *United States v. Hardy*, 77 M.J. at 442–43. Thus, even if Appellant waived both issues, this court must determine whether an error exists that merits piercing his waivers. *See Hardy*, 77 M.J. at 443. On its face, Appellant's assignment of error suggests that the court-martial may have admitted and considered a victim impact statement delivered by a person who was not properly appointed pursuant to Article 6b, UCMJ, R.C.M. 1001A(e), and 801(a)(6); the admission of which prejudiced Appellant. Accordingly, we find it appropriate to address the substance of Appellant's claims. *See Lee*, unpub. op. at *17.

### b. Lack of Designation in Writing

As stated above, it is possible there was no comment by trial defense counsel because the military judge had already appointed JR in writing prior to trial. In that case, as we have seen with other record of trial omissions, appellate government counsel could have moved to attach the military judge's written designation in an attempt to show Appellant suffered no material prejudice because the error did not affect the proper appointment of JR. Here, the Government did not file a motion to attach a written appointment by the military judge. Instead, the Government's answer to this assignment of error simply states, "Unfortunately here, there is no discussion on the record concerning AR's mother having been appointed her designee." Under these circumstances, we will presume a written appointment never happened. Failure by the military judge to appoint a designee in writing is a clear and obvious error. As such, after examining Appellant's remaining allegations of error by the military judge, we will test for material prejudice below.

### c. Consideration of Substance of the Entire Statement

Considering the substance of the entire statement submitted by a non-appointed individual pursuant to Article 6b is a clear and obvious error. Trial counsel's statement that JR is the "Article 6b guardian of [AR]" does not eliminate this error as trial counsel had no authority to appoint JR. R.C.M. 801(a)(6) reserves this responsibility solely to the military judge. As such, after examining Appellant's remaining allegation of error by the military judge, we will test for material prejudice below.

### d. Line About Custody

As noted above when the trial defense counsel objected to "the line about the biological mother taking custody back," the military judge overruled the objection. Our review of Court Exhibit 1 reveals one sentence that specifically uses the word "custody," although two other sentences discuss having AR back with JR. The line referencing custody states: "I wanted custody back because I felt like I wasn't there to protect her."

Since this objection was properly preserved at trial we will consider whether the military judge abused his discretion. The military judge made two clarifying rulings on how he would consider the loss of custody by QH after he admitted Court Exhibit 1. In the first ruling, he twice referenced "victim impact testimony" and never referenced Court Exhibit 1, a written unsworn statement. We find his first clarification ruling only applied to the testimony of QH and not the written unsworn statement of JR given on AR's behalf. A written unsworn statement and testimony are two different things. The first is governed by R.C.M. 1001(b)(4), is evidence in aggravation, and is limited by Mil. R. Evid. 403. The second is governed by R.C.M. 1001A, is in-

dependent of whether a witness testified, and implements the victim's right to be reasonably heard.

We also conclude the military judge's second clarification ruling also did not address his admission of Court Exhibit 1. The military judge stated, "In other words, the accused's crime did not take AR from [QH, her guardian]. I did not consider the evidence in [that] way." As we have held that a victim unsworn statement is not "evidence" and this precedent was binding on the military judge, we conclude that once again, the military judge was referring to the testimony of QH and not the written unsworn statement of JR. *United States v. Hamilton*, 77 M.J. 579, 585 (A.F. Ct. Crim. App. 2017) (en banc), *rev. granted*, 77 M.J. 368 (C.A.A.F. 2018).

We now must determine whether the line that JR wrote—"I wanted custody back because I felt like I wasn't there to protect her"—was victim impact of AR. We find this statement to not reference victim impact that AR suffered, but instead shows what JR's state of mind was upon learning of the offense that Appellant committed. This statement did not include direct "financial, social, psychological, or medical impact" that AR suffered and was therefore improper for consideration under R.C.M. 1001A(b)(2) as victim impact. As the senior trial counsel made clear, JR was not attempting to make her own victim impact statement, she was only exercising AR's right to be reasonably heard under R.C.M. 1001A(e). Under these circumstances, we find the military judge abused his discretion when he permitted JR to include a line in the unsworn statement about JR's rationale for seeking custody of AR. We test for material prejudice below.

### e. Material Prejudice

"The test for prejudice is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (internal quotation marks and citations omitted). When determining whether an error substantially influenced a sentence, we examine the strength of the Government's case, the strength of the Defense's case; and the materiality and quality of Court Exhibit 1. *Id.*

Here, the Government's case was exceptionally strong. Appellant admitted variations of his guilt to two different law enforcement agencies. Appellant's video recorded statement to AFOSI was admitted into evidence, as well as the security videos from the ship. Trial counsel introduced testimony from HB and QH during presentencing, the substance of which is detailed above. AR testified during findings that when she saw Appellant in her room she was "sad" and she "just wanted to punch him in the eye."

In contrast, the Defense's case was comparatively weak. Appellant's presentencing case consisted of an unsworn written and oral statement, two character letters, and accolades that Appellant received.

The materiality and quality of the one paragraph unsworn statement by JR as Court Exhibit 1 was limited. JR states AR is sensitive to doors being locked, always likes to sleep with her mother, is always around her mother, and she did not like a white baby doll because it reminded her of "the man." Similar information was already before the military judge in the form of testimony from QH who testified that AR slept beside her, followed her every move, and did not want to be by herself. *See United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F 2007) ("When a fact was already obvious from . . . the testimony at trial' and the evidence in question 'would not have produced any new ammunition,' an error is likely to be harmless.") (alteration in original) (citations omitted)). Although the testimony of QH was describing AR's reactions with QH vice her biological mother, JR, the reactions of AR to Appellant's crimes are the crux of the evidence.

The maximum sentence available in this case was a dishonorable discharge, confinement for 20 years and 6 months, forfeiture of all pay and allowances, and reduction to E-1. The trial counsel argued for a dishonorable discharge, confinement for five years, total forfeiture of all pay and allowances and reduction to E-1. Appellant was sentenced to a dishonorable discharge, 1 year and 10 months of confinement, forfeiture of all pay and allowances, reduction to E-1, and a reprimand despite the admission of Court Exhibit 1 and comparative weakness of Appellant's sentencing case.

Moreover, it is highly relevant when analyzing the impact of the error on the sentence that the case was tried before a military judge, who is presumed to know the law. *Barker*, 77 M.J. at 384 (citing *United States v. Bridges*, 66 M.J. 246, 248 (C.A.A.F. 2008) (citations omitted)). We find the admission of Court Exhibit 1 did not substantially influence Appellant's sentence.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court